**PROTECT OUR WATER and San Joaquin Raptor/Wildlife Rescue Center, non profit organizations, Plaintiffs,**

v.

**Lt. Gen. Robert B. FLOWERS, Commander, U.S. Army Corps of Engineers, Col. Michael J. Conrad Jr., District Engineer, Sacramento District, U.S. Army Corps of Engineers, and Diablo Grande Limited Partnership, Defendants.**

No. CIV.S–03–0986 WBS/JFM.

United States District Court,
E.D. California.

March 22, 2004.

Mark A. Brown, Wildlife & Marine Resources Section, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, for United States.

## MEMORANDUM AND ORDER

SHUBB, District Judge.

Plaintiffs brought this action pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.;* the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.;* the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.;* and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* to challenge the issuance by defendant U.S. Army Corps of Engineers ("Corps") to defendant Diablo Grande Limited Partnership ("Diablo Grande") of a permit for the dredge and fill of waters of the United States. Plaintiffs now move for a preliminary injunction and summary judgment on all claims; defendants have filed cross motions for summary judgment on all claims.

### I. *Factual and Procedural History*

Plaintiff Protect Our Water ("POW") is an unincorporated association formed for the preservation of environmental resources in California. (Cmpl.¶ 11(a)). Plaintiff San Joaquin Raptor/Wildlife Rescue Center ("Center") is a non-profit membership organization formed to preserve wildlife habitat and the environment. (*Id.* ¶ 11(b)).

Defendants Lt. Gen. Robert B. Flowers, Commander of the Corps, and Michael J. Conrad Jr., District Engineer for the Sacramento District of the Corps, (collectively, "federal defendants") are sued in their official capacities. (*Id.* ¶ 19). In their official capacities, the federal defendants are generally responsible for implementing the CWA's section 404 permitting program.

(*Id.* ¶ 19). Defendant Diablo Grande is a limited partnership that purchased a 29,-500 acre site in 1980 for a planned community ("the Project") located in southwestern Stanislaus County, California. The Project consisted of five phases, to be built over 20–25 years, and included six golf courses, swim and tennis facilities, a hotel and executive conference centers, a research campus, winery and vineyard, municipal facilities, commercial centers, shops and offices, and 5,000 residential units divided into five "villages." (Pls.' Statement of Undisputed Facts ("SUF") ¶ 1). However, local entitlements for all but the first phase, Oak Flat Village ("Phase 1") were subsequently invalidated. (*See* A.R. 02272; 04828).

Phase 1 of the project is to be set on approximately 2,250 acres in Oak Flat Valley, located in the Salado Creek drainage. (Pls.' SUF ¶ 4). Phase 1 includes 2,000 residential homes constructed on approximately 830 acres; a town center; shopping center; public services; hotel and conference center; and resort complex constructed on approximately 70 acres; an open space area of about 1,160 acres, including two golf courses; and a road system encompassing approximately 187 acres. (*Id.* ¶ 5). Unit 1 of Phase 1 consists of a hotel and conference center, winery, 313 houses and an access road ("cut-across road") to the Phase 1 site from Interstate 5. (A.R. 05277). Construction of Unit 1 of Phase 1 has begun. (Pl.'s SUF ¶ 9). Two golf courses have already been constructed, the cut-across road has been built, and additional work is ongoing. (*Id.* ¶¶ 9–10). No construction has begun on the remainder of Phase 1 or on Phases 2–5 of the Project. (*Id.* ¶ 11).

Since September 1992, Diablo Grande has received multiple Nationwide Permit ("NWP")[1] Number 26 authorizations from the Corps for impact to United States waters for Phase 1 of the Project. (A.R. 05355; 06821). The first of Diablo Grande's NWP requests was for the issuance of a permit for the cut-across road in September 1992. Because the cut-across road could potentially affect the endangered San Joaquin kit fox ("kit fox")[2], the Corps denied this request on November 13, 1992, pending completion of a consultation with the U.S. Fish and Wildlife Service ("Service") pursuant to section 7 of the ESA. (A.R.00046).

The Corps requested formal consultation with the Service concerning the effect of the proposed fill related to the construction of the cut-across road on the endangered San Joaquin kit fox. (A.R.00047). The Service issued its biological opinion regarding the permit for the cut-across road on January 10, 1995. (A.R. 00808–831).

A. *1995 Biological Opinion*

In the 1995 biological opinion ("Biological Opinion"), the Service concluded that issuance of a permit to fill wetlands for construction of the cut-across road is "not

1. In contrast to individual permits issued under section 404 of the CWA, NWPs are issued when the Corps formally adopts and publishes them in the Federal Register after a hearing and the opportunity for public comment. Thus, individuals do not apply for NWPs, and the Corps does not issue NWPs to individuals. Rather, the NWPs themselves authorize limited dredging and filling activities within a scope defined by a given NWP. Under the NWP program, upon receiving a verification request, the Corps simply determines whether the activity complies with the terms and conditions of the NWP. *See Utah Council, Trout Unlimited v. United States Army Corp of Eng'rs,* 187 F.Supp.2d 1334, 1341–42 (D.Utah 2002); 33 C.F.R. §§ 320.1, 325.5, 330.1, 330.2, 330.6.

2. The Service listed the San Joaquin kit fox as an endangered species in 1967. *See* 50 C.F.R. § 17.11; 32 Fed.Reg. 4001 (March 11, 1967).

likely to jeopardize the continued existence of the San Joaquin kit fox. Critical habitat has not been designated for this species; therefore, none shall be destroyed or adversely modified." (A.R.00809).[3]

As part of the consultation process, the Service requested that Diablo Grande perform studies, using Service protocol, of the kit fox in Oak Flat Valley. (A.R.06631–32). These surveys included walking transects, spotlighting, automatic camera stations, and scent stations. (A.R.06569). The surveys were conducted in May and June of 1993, and again in August and September of 1993. (*Id.*). Although the surveys found no evidence of current kit fox activity, Oak Flat Valley contains suitable habitat and potential dens for the kit fox. (*Id.*). The Service noted that there have been kit fox sightings within five miles of Oak Flat Village Road and Diablo Grande property. (A.R.00810). Four potential dens were found in Oak Flat Valley. (A.R.00810–11). The Service determined that Oak Flat Valley may provide a potential movement corridor to and from the grassland located west of Oak Flat Valley because of the prey availability and the proximity to known kit fox habitat. (*Id.*).

The Service listed possible adverse effects of Diablo Grande's construction of the cut-across road as: (1) harassment resulting from increased levels of human disturbance, and implementation of certain mitigation measures, such as excavation of kit fox dens to prevent entombment of foxes; (2) direct injury or death of individual animals by vehicle strikes resulting from increased construction related traffic, or through entrapment in open holes or trenches; (3) displacement into adjacent areas, and accompanying increased predation, exposure, starvation, or stress through disorientation, loss of shelter, and intraspecific and interspecific aggression. (A.R.00811).

The Service found that "[a]n indirect effect of the access road will be the construction of the Diablo Grande subdivision." (*Id.*). Although the Diablo Grande land use plan indicated that approximately 12,000 acres would be "Conservation Areas," the Service expressed the belief that the development of the entire Diablo Grande project would remove approximately 11,708 acres of potential kit fox denning and foraging habitat, and could further fragment kit fox populations. (*Id.*).

The Service also considered the impact of construction of the water transmission line for which Diablo Grande sought a permit in October 1994, and determined that construction might result in temporary disturbance of a potential kit fox movement corridor. (A.R.00812). Preclusion of use of the movement corridors would further fragment the existing range of the kit fox. (*Id.*). Habitat fragmentation, according to the Service, is the leading cause of extinctions of populations worldwide, and the Service warned that "[c]omplete fragmentation in this area of the kit fox range would probably lead to extinction of the population north of the project area...." (*Id.*). Because of the possible fragmentation of the kit fox population as a result of the construction, the Service recommended implementation of a program to preserve the kit fox corridor through Oak Flat Valley. (*Id.*).

The incidental take statement included in the Biological Opinion anticipated "take ... as a result of fill for the construction of the access road ... [and] development of the Diablo Grande subdivision." (A.R. 00814). The Service estimated that con-

---

**3.** At the time the Biological Opinion was released, the Service was revising its recovery plan for the kit fox. (A.R.00809). The San Joaquin Kit Fox Recovery Plan ("Recovery Plan") was completed by the Service in 1998. (A.R.02129–78).

struction of the access road "may result in one (1) kit fox being harmed or killed." (*Id.*). But "[t]he Service consider[ed] the number of animals subject to harassment from noise vibrations, and capture or excavation of dens and burrows to be impracticable to estimate." (*Id.*). To minimize the impacts of incidental take, and to be exempt from the take prohibitions of section 9 of the ESA, the Corps and Diablo Grande were required to implement "reasonable and prudent measures." (A.R. 00814). These measures included: (1) mitigation for anticipated direct impacts on the kit fox via acquisition of 125 acres of grassland habitat to be held in perpetuity by either the Department of the Interior, or an agency approved by the Department of the Interior and the Service, and (2) implementation of the *Standardized Recommendations for Protection of the San Joaquin Kit Fox.* Also, Diablo Grande was required to prepare and implement a plan to offset the indirect effects (the Diablo Grande subdivision and associated facilities) of the construction. (A.R.00814–16).

While the consultation with the Service was still ongoing, the Corps authorized, under NWP 26, impacts to .82 acres of United States waters for development of the Ranch Golf Course. (A.R.05355). After the Service issued the Biological Opinion, the Corps authorized, under NWP 26, the following: (1) impacts to 3.16 acres of United States waters for construction of Diablo Grande Parkway and a water transmission pipeline; (2) impacts to .57 acres of United States waters for construction of the Legends Golf Course; and (3) impact to 3.59 acres of United States waters for development of a cut-across road. (*Id.*). The permit for the cut-across road expired before Diablo Grande could build the road. (A.R.05125).

B. *Permit Process*

On July 31, 1998, Diablo Grande submitted its final permit application to the Corps for construction of Oak Flat Village; specifically, the permit application addressed the construction of the Phase 1 residential areas and the cut-across road, resulting in discharge of fill material to 5.71 acres of waters of the United States. (A.R.02023–26). Diablo Grande proposed to mitigate effects of the construction of wetlands by restoring 13.92 acres. (A.R. 02032–33). The Corps issued Public Notice 19920769 for the permit application in September 1998. (A.R.02031–119). During the public notice and comment period, the Corps received comments from the United States Environmental Protection Agency ("EPA") (A.R.02120–23), Stanislaus County (A.R.02128) (stating that it had no comments at this time), Robert Hansen (a neighboring land owner) (A.R. 02251–54), Diane G. Kindermann (an attorney representing neighboring landowners) (A.R.02257–60), and the Service (A.R. 02261–65).

1. *Comments from EPA*

The EPA wrote several letters objecting to the permit. (*See, e.g.,* A.R. 02120–23; A.R. 02267–70; 02560–72; 03619–20). In the EPA's letters of September 14, 1998, October 27, 1998, May 5, 1999, and August 9, 1999, the EPA "strongly" objected to the project, expressing the following concerns: (1) mischaracterization of the project purpose and accompanying consideration of less-damaging practical alternatives under the EPA's 404(b)(1) Guidelines; (2) the individual and cumulative impacts to waters of the United States that would result from the construction of the entire 29,500 acre Project; (3) significant degradation of the aquatic environment; and (4) the need for an Environmental Impact Statement (EIS). (A.R. 02121; 02560–2565; 03619–20).

Although the Corps had already issued three approvals for the fill of waters pur-

suant to NWP 26,[4] the EPA noted that it disagreed with the Corps's conclusion regarding the independent utility of the three previously authorized projects. The EPA urged that "[i]n the case of the proposed Diablo Grande project, impacts to waters of the United States must be assessed for the entire project (Phases 1 through 5), not just Phase 1 alone." (*Id.*). According to the EPA, waters located on the proposed Project site are important to ecosystem health and development of the Project would have direct and indirect impacts on several watersheds. (A.R.02122). The EPA concluded that the discharges associated with Project "*may* have substantial and unacceptable impact on aquatic resources," and "strongly recommend[ed] a programmatic EIS to evaluate the individual and cumulative impacts to the environment." (*Id.*) (emphasis in original).

On October 25, 2000, the Corps prepared a notice for the EPA of its intent to issue the Section 404 permit to Diablo Grande. In the notice, the Corps addressed the four issues on which the two agencies continued to disagree regarding the permit issuance: (1) the scope of what constitutes a single and complete project; (2) need for an EIS; (3) compliance with 404(b)(1) Guidelines regarding determination of least damaging practicable alternatives to the project; and (4) the proposal to preserve 5800 acres in the Phase 1 development area. (A.R.05117–18).

Pursuant to the CWA Section 404(q) Memorandum of Agreement ("MOA") between the EPA and the Department of the Army, the EPA requested elevation of the permit decision to the Assistant Secretary of the Army (Civil Works) ("ASACW").

(*See* A.R. 05165). The ASACW denied the EPA's request after reviewing "the concerns raised[,] . . . the District's decision documents and draft permit, and information provided by the applicant, and [after] conducting an on-site inspection." (A.R. 05265). The ASACW determined that Phase 1 "constitutes a single and complete project with independent utility," the aquatic resources located within the boundary of Phase 1 are not of national importance, and no substantial and unacceptable adverse impacts will result from the proposed permit. (*Id.*). The ASACW agreed with the Corps that no EIS need be prepared for the entire 29,500 acre Project. (*Id.*). In addition, the ASACW concluded that the project represented the least environmentally damaging practicable alternative, and that the direct impacts will be addressed by the mitigation plan. The ASACW determined that the Corps could proceed to issue the permit. (*Id.*). However, the ASACW directed the Corps to ensure that secondary, indirect and cumulative impacts were completely documented and to evaluate the need for additional mitigation to offset those impacts. (A.R.05266).

After the issuance of the ASACW's decision and before issuance of the permit, on January 17, 2001, the EPA and Diablo Grande entered into an "Agreement Regarding the Diablo Grande/Oak Flat Village Section 404 Permit." (A.R.05272). Diablo Grande agreed to permanently protect all lands located in the "Sawtooth" area (amounting to 1,230 acres), which contains a portion of the Orestimba Creek and its tributaries. (A.R. 05272; 05280–81). The EPA agreed that "protection of the Additional Mitigation Lands (the "Saw-

---

4. Apparently, some confusion exists as to how many NWP authorizations were issued by the Corps to Diablo Grande pertaining to the development of Phase 1. The EPA has stated that since 1992, the Corps has issued six NWP authorizations for construction at the Phase 1 site. (A.R.05125). However, the EA suggests that only three NWP authorizations were issued.

tooth" area) as a condition of the Permit in combination with the mitigation currently included in the Permit will fully and completely compensate for all direct, indirect and cumulative impacts to aquatic resources associated with the Permit." (*Id.*). In addition to the "Sawtooth" preserve, Diablo Grande also requested that it establish a second preserve, a 1035 acre area containing a portion of Orestimba Creek. (A.R.05380).

### 2. Comments from the Service

The Service responded to the Public Notice by a letter dated October 2, 1998, in which it commented that the 29,500 acre Project "is a single and complete project .... To avoid piecemealing, the impacts to waters of the United States should be assessed for the entire project before additional construction is permitted." (A.R. 02261–65). The Service also advised that a mitigation plan be developed for the entire Project, and that impact to existing wetlands should be avoided. (A.R.02261). Finally, the Service recommended that the Corps conduct "appropriate surveys" and initiate consultation on the threatened California red-legged frog,[5] "if the frog or any other special status species is identified to be present on the development site." (A.R.02264). In a later letter, dated October 8, 1998, the Service indicated that Diablo Grande had yet to comply with the terms and conditions of the Biological Opinion requiring the purchase of 125 acres for a perpetual preserve, implementation of the *Standardized Recommendations for Protection of the San Joaquin Kit Fox,* and preparation and implementation of a plan to minimize the impacts of habitat loss and fragmentation of kit fox populations due to the proposed project. (A.R.07158–59). The Service also warned

that it "believes that unauthorized take of [the kit fox] may be occurring as a result of the Diablo Grande project." (*Id.*).

On February 27, 1999, Diablo Grande submitted the red-legged frog surveys requested by the Service. (A.R.02429–40). The surveys, which Diablo Grande alleges were done according to Service protocol, concluded that although habitats with characteristics that may be suitable for the red-legged frog appear to exist at the Phase 1 site, red-legged frogs were not present within the Phase 1 site. (A.R. 02440).

### 3. Permit and Environmental Assessment ("EA")

On June 20, 2001, the Corps issued Diablo Grande a permit pursuant to section 404 of the CWA, authorizing Diablo Grande to discharge dredged and fill material into 5.44 acres of waters of the United States for the construction of the cutacross road and residential lots within the Phase 1 property. (A.R.05297–303). The permit provided conditions that Diablo Grande had to meet prior to receiving authorization from the Corps to begin construction. (*Id.*). The permit stated that the Corps "may reevaluate its decision on this permit at any time the circumstances warrant." (A.R.05301–02).

On the same day, the Corps issued its Environmental Assessment ("EA") for the proposed project. The EA is organized into three main sections. The first describes the proposed project and mitigation plans. (A.R.05353–57). The second section discusses the environmental and public interest factors considered by the Corps in the EA. In this section, the Corps lays out the possible alternatives to the proposed project available to Diablo Grande. (A.R.05353–57). Also, this sec-

---

5. In 1996, the Service listed the California red-legged frog as a threatened species under the ESA. 61 Fed.Reg. 25813 (May 23, 1996).

tion includes a discussion of work to be performed by Diablo Grande prior to engaging in work authorized by the permit, such as the posting of a performance bond, development of a final comprehensive mitigation and monitoring plan, mitigation for the total loss of 9.08 acres of waters of the United States within the Phase 1 area by the creation of 15.21 acres of waters, mitigation for secondary and indirect effects to waters of the United States within the Phase 1 area, and creation of preserves under a permanent conservation easement. (*Id.*).

The third section is devoted to the environmental consequences of the project and the mitigation measures adopted. (A.R.05357–76). This section analyzes aspects of the environment affected by the proposed construction, such as the development area's physical, chemical and biological characteristics, which includes discussion of the possible presence of the endangered kit fox and the threatened red-legged frog, and human uses. (*Id.*). Included in this section is an analysis of the impacts on the above-listed characteristics as a result of the proposed construction. (*Id.*). The final section provides a summary and evaluation of the comments received during the public notice and comment period for the permit. (A.R.05377–85). The EA concluded with a finding of no significant impact (FONSI), a determination that an EIS is unnecessary before the issuance of a permit for the proposed construction because the permitted action will not have a significant impact on the quality of the human environment. (A.R.05383).

C. *Post–Issuance Response*

Prior to beginning construction of Oak Flat Village, Diablo Grande completed additional kit fox surveys in October and November 2001, and March 2002. (A.R. 05639). An additional kit fox survey in the vicinity of the proposed cut-across road for

Phase 1 was done prior to the start of construction in May 2002 to fulfill the requirements of the Biological Opinion. (A.R.06011). No signs of kit fox activity were observed within 300 feet of the proposed cut-across road. (*Id.*).

The Service, in a series of letters in 2002, requested that the Corps reinitiate consultation under section 7 of the ESA. (A.R. 05838–51; 05886–91; 05968–75; 06177–84). In these letters, the Service maintained that its Biological Opinion was conducted only for the effects on the kit fox at wetted areas and adjacent wetted areas in the area for the cut-across road, not for the 29,500 acre Project area. (A.R. 05838–43). The Service stated that it had information that kit fox had been sighted within 10 miles of the proposed project location, and that the proposed project lies partially within an important kit fox movement corridor. (A.R.05888). The Service expressed concern that the permitted construction will exceed the incidental take coverage for the kit fox permitted in the Biological Opinion because Diablo Grande's pre-construction survey identified potential kit fox dens on the Phase 1 site. (A.R.05846). Also, the Service requested formal consultation on the red-legged frog, which was listed as a threatened species after the Biological Opinion was done, and which the Service believed may be affected by the Phase 1 construction. (A.R. 05838–43).

On July 22, 2002, the Corps informed Diablo Grande that work authorized by the permit could begin. (A.R.06021). In response to the Service's letters, the Corps met with Service staff and then, in an October 4, 2002 letter, disagreed with the Service's assertions and declined the Service's request to reinitiate consultation. (A.R.06225–26). The Corps determined that no information suggested that the existing Biological Opinion was insufficient to provide coverage for the Phase 1 construc-

tion. (*Id.*). The Corps also declined to initiate consultation regarding the red-legged frog, determining that Diablo Grande's surveys indicated that no ·red-legged frogs were found within the Phase 1 area. (*Id.*).

On October 15, 2002, the Service responded with a final letter, urging the Corps to reinitiate consultation, reiterating its belief that construction on the cut-across road had already resulted in take of the kit fox in excess of that allowed by the Biological Opinion, and that indirect effects associated with the cut-across road will result in further take of the kit fox in excess of that permitted by the Biological Opinion. (A.R.06398–403). The Service also noted that the Corps did not consult with it for the Phase 1 development area, but only the cut-across road in the Biological Opinion. (*See* A.R. 06401). According to the Service, red-legged frogs have· been observed immediately north of the Phase 1 development site in Del Puerto Creek and in the Orestimba Creek drainage, located partially within Diablo Grande property in the south. (A.R.06396). The Service advised that because red-legged frogs are known to migrate two miles without regard to topography or vegetation types, the two known populations at Del Puerto Creek and Orestimba Creek may use areas at the proposed cut-across road and Phase 1 development site; thus, the Service concluded that consultation was necessary as the development of Phase 1 and the cut-across road "likely will result in take of the red-legged frog." (*Id.*). Also, the Service noted that one of the surveys relied upon by the Corps did not follow Service protocol, and the other was done at a time when Salado Creek was dry. (*Id.*).

Plaintiffs filed their complaint on May 9, 2003 alleging seven claims for relief: (1) violation of NEPA and the APA by the Corps's failure to prepare an EIS on Phase 1; (2) violation of NEPA and the APA by the Corps's failure to prepare an EIS for Phases 1–5 of the Project; (3) violation of the CWA and the APA by the Corps's failure to comply with section 404(b)(1) Guidelines for Phases 1–5 of the Project; (4) violation of section 7 of the ESA and the APA by the Corps's failure to consult with the Service; (5) violation of section 7 of the ESA and the APA by the Corps's failure to conserve listed species; (6) prohibited taking of the kit fox and the red-legged frog by the Corps in violation of section 9 of the ESA and the APA; (7) prohibited taking of the kit fox and the red-legged frog by Diablo Grande in violation of section 9 of the ESA. (Cmpl.¶¶ 111–39).

Plaintiffs request that the court set aside the permit, and enjoin the Corps from issuing any new permit for dredge and fill associated with any portion of the Project until the Corps prepares an EIS on the entire Project and consults with the Service on impacts to the kit fox and the red-legged frog. Plaintiffs also request that the court enjoin Diablo Grande from any further construction activity on the remainder of Phase 1 or on Phases 2–5 until the Corps has issued a valid new permit and Diablo Grande has received an incidental take permit for Phase 1 of the Project individually, and Phases 1–5 of the Project together. Plaintiffs also seek a preliminary injunction pending completion of this litigation, and pending any further environmental review the court finds necessary.[6] (Cmpl. at _35–37).

---

6. The motion for a preliminary injunction appears moot because plaintiffs have steadfastly refused to allow that motion to be set for hearing before the hearing on their motion for summary judgment, in which plaintiffs

request permanent injunctive relief; defendants have made cross motions for summary judgment; and this case is based primarily on an undisputed administrative record.

## II. *Discussion*

### A. *Standard for Summary Judgment*

The court must grant summary judgment to a moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party adverse to a motion for summary judgment may not simply deny generally the pleadings of the movant; the adverse party must designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Simply put, "a summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). The non-moving party must show more than a mere "metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. *Agency Action—Claims 1 through 6*

Plaintiffs' first six claims, relating to the Corps's failure to produce an EIS, the decision to issue a permit for the dredge and fill of United States waters, and violations of the ESA, all necessitate review of the actions of an administrative agency. Judicial review of actions by administrative agencies is governed by 5 U.S.C. § 706(2)(A), which states that a reviewing court must set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1114 (9th Cir.2000) (applying the "arbitrary and capricious" standard to the agency's decision not to

prepare an EIS); *Friends of the Earth v. Hintz*, 800 F.2d 822, 830–31 (9th Cir.1986) (applying the "arbitrary and capricious" standard to the agency's decision to issue a section 404 permit under the CWA); *Pacific Coast Fed'n of Fishermen's Ass'ns. Inc. v. United States Bureau of Reclamation*, 138 F.Supp.2d 1228, 1239 (N.D.Cal. 2001) (applying the "arbitrary and capricious" standard to review of an agency's action under the ESA); *Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife*, 273 F.3d 1229, 1235–36 (9th Cir. 2001) ("Judicial review of administrative decisions involving the ESA is governed by section 706 of the APA"); *Sierra Club v. Glickman*, 67 F.3d 90, 95–96 (5th Cir.1995) (holding the "arbitrary and capricious" standard applies to section 9 claims under the ESA against a federal agency).

 This standard is a "deferential standard ... designed to ensure that the agency considered all of the relevant factors and that its decision contained no clear error of judgment." *Pacific Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir.2001) (internal quotations omitted). An agency action should only be overturned when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The court must ask whether the agency considered "the relevant factors and articulated a rational connection between the facts found and the choice made." *Natural Resources Def. Council v. United States Dep't of the Interior*, 113 F.3d 1121, 1124 (9th Cir.1997). The court is not empow-

ered to substitute its judgment for that of the agency. *Arizona Cattle,* 273 F.3d at 1236 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The task of the reviewing court is to apply the arbitrary and capricious standard of review to agency actions based on the administrative record presented by the agency to the court. *Citizens to Preserve Overton Park,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136.

### 1. *NEPA*

NEPA is "our basic national charter for protection of the environment ... [i]t establishes policy, sets goals ... and provides means for carrying out the policy." 40 C.F.R. § 1500.1(a). NEPA "does not set out substantive environmental standards, but instead establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." *Metcalf v. Daley,* 214 F.3d 1135, 1141 (9th Cir.2000) (citations omitted). To this end, NEPA requires that an EIS be prepared for all "major Federal actions significantly affecting the quality of the human environment." *Id.* (quoting 42 U.S.C. § 4332(C)). The NEPA implementing regulations promulgated by the Council on Environmental Quality ("CEQ") define major federal actions to "include new and continuing activities, including projects ... regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a).

If, as is the case here, an agency's regulations do not categorically require the preparation of an EIS, the agency must then first prepare an EA to determine whether the action will have a significant effect on the environment. 40 C.F.R. § 1501.4. An EA is a "concise public document for which a Federal agency is responsible that serves to ... [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). NEPA regulations require that the preparation of an EA "involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments ...." 40 C.F.R. § 1501.4(b). If, in light of the EA, the agency determines that its action will significantly affect the environment, then an EIS must be prepared; if not, then the agency must issue a FONSI, "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant." *Pub. Citizen v. Dep't of Transp.,* 316 F.3d 1002, 1022 (9th Cir.2003) (quotations omitted) *cert. granted,* 540 U.S. 1088, 124 S.Ct. 957, 157 L.Ed.2d 793 (Dec. 15, 2003) (on question of jurisdiction); *see Metcalf,* 214 F.3d at 1142; 40 C.F.R. §§ 1501.4, 1508.9.[7]

The CEQ regulations define the crucial phrase "significantly affect" to clarify the situations in which an agency must prepare an EIS. As used in NEPA, "significantly" requires considerations of both context, which refers to the society, region and locality of the proposed project, and intensity, which refers to the severity of impact. *Pub. Citizen,* 316 F.3d at 1022–23; 40 C.F.R. § 1508.27.[8]

---

7. The Corps's "NEPA Implementation Procedures for the Regulatory Program" state that an EA and FONSI should be combined into a single document. 33 C.F.R. § Pt. 325, App. B(7). Here, the EA and FONSI were combined into a single document. (A.R.05353–85).

8. Title 40 C.F.R. § 1508.27(b) lists ten factors that contribute to the "intensity" of a proposed action:
 (1) beneficial and adverse impacts;
 (2) affect on public health/safety;
 (3) unique characteristics of the geographic area;

■■ A reviewing court is not permitted to substitute its judgment for that of the agency, but rather must "simply ... ensure that [the agency] has adequately considered and disclosed the environmental impacts of its actions." *Pub. Citizen*, 316 F.3d at 1021 (quotations omitted). Thus, the court must defer to an agency's decision to not to prepare an EIS if it is fully informed and well-considered. *Id.*

Here, plaintiffs contend that the Corps's failure to prepare an EIS prior to issuing a permit for development of Phase 1 and failure to prepare an EIS for the entire Project, Phases 1–5, was arbitrary and capricious. Plaintiffs argue that an EIS was required given the: (1) impact on wetlands and ecologically critical areas; (2) substantial controversy about the potential impacts of the proposed action; (3) significant cumulative impacts on the environment; (4) consideration of connected actions; and (5) significant impact on endangered and threatened species.

(i) *Impact on Wetlands and Ecologically Critical Areas*

■ The CEQ regulations provide that one factor that contributes to the determination of a proposed action's "significant effects" is whether the project area has "[u]nique characteristics ... such as proximity to ... wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). As evidence of the unique characteristics of the Phase 1 area, plaintiffs point to the EPA's October 27, 1998 letter to the Corps in response to

public notice of the permit application, in which the EPA stated that "discharges associated with this project *will* have substantial and unacceptable impact on aquatic resources of national importance" and recommended preparation of an EIS. (A.R.02267) (emphasis in original). Plaintiffs also point to an August 1999 letter from the EPA to Senator Dianne Feinstein, in which the EPA described the entire Project area as "encompassing a rare collection of unspoiled watersheds" and specifically pointed to the Phase 1 site as containing the Salado Creek watershed. (A.R.03621). Finally, plaintiffs direct the court to two post-permit issuance EPA documents in which the EPA discussed the importance of wetlands at the Phase 1 site, stating that the waters at the Phase 1 site "perform twelve interrelated hydrologic, biogeochemical, and habitat support functions," and that "the overall functional capacity of waters within Phase 1 is high." (A.R. 05442; A.R. 05121).

Here, as the EA noted, after the EPA requested elevation of the permit decision to the ASACW, the ASACW reviewed "the concerns raised[,] ... the District's decision documents and draft permit, ... information provided by the applicant, and conducting an on-site inspection" and determined that "the aquatic resources located within the boundary of Phase 1 are not of national importance, and no substantial and unacceptable adverse impacts will result from the District's proposed permit." (A.R.05265). As described in the EA, the ASACW determined that the waters af-

(4) degree to which effects on quality of human environment are likely to be controversial;
(5) degree to which the possible effects are highly uncertain;
(6) degree to which the action may establish a precedent for future actions;
(7) whether the action is related to other actions that have cumulatively significant impacts;

(8) degree of effect upon historic places;
(9) degree to which action may adversely affect an endangered or threatened species; and
(10) whether the action threatens a violation of law.

fected by the proposed project "are primarily ephemeral drainages. The habitat value of these drainages is not substantially different than the surrounding uplands." (A.R.05380).

The administrative record demonstrates that the Corps closely considered the EPA's opinion, undertook its own evaluation, and drew a different conclusion regarding the impact to the wetlands on the project site and the uniqueness of the geographic features of the project site. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir.1992) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive .... Once [the court is] satisfied that an agency's exercise of discretion is truly informed, we must defer to th[at] informed discretion").

Moreover, the EPA and Diablo Grande entered into an "Agreement Regarding the Diablo Grande/Oak Flat Village Section 404 Permit" (A.R. 05272) in which Diablo Grande agreed to permanently protect all lands located in the "Sawtooth" area (amounting to 1,230 acres), which contains a portion of the Orestimba Creek and its tributaries. (*Id.*; A.R. 05280–81). The EPA agreed that "protection of the Additional Mitigation Lands (the "Sawtooth" area) as a condition of the Permit in combination with the mitigation currently included in the Permit will fully and completely compensate for all direct, indirect and cumulative impacts to aquatic resources associated with the Permit." (*Id.*). Thus, evidence in the administrative record demonstrates that impact to any unique area of the project site was mitigated.

The EA also demonstrates that the Corps considered the characteristics of the waters affected by the permit. The EA describes the "affected waters of the U.S. in the Phase 1 and access road areas [as] ... primarily within the Salado Creek watershed" including "intermittent streams, seasonal wetlands, stock ponds, and alkali seep." (A.R.05353). According to the EA, "[m]any of the stream beds have been degraded ... [and][t]he ephemeral stream beds carry water only during and after major storm events." (A.R.05354). The EA also provides a description of the physical characteristics of the waters, including the substrate, currents and drainage patterns, turbidity, water quality, storm and erosion buffers, erosion, aquifer recharge, and baseflow functions as well as a "concise description of impacts" to these characteristics. (A.R.05362).

Accordingly, the Corps was not arbitrary and capricious in its determination regarding the impacts to the unique characteristics of the affected area.

### (ii) *Substantial Controversy about Potential Impacts*

 In determining the significance of a proposed action's effects on the environment, an agency must evaluate "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). A controversy sufficient to require preparation of an EIS occurs "when substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor, or there is a substantial dispute [about] the size, nature, or effect of the major Federal action." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir.2001). A substantial dispute exists when evidence, raised *prior* to the preparation of an EIS or FONSI casts serious doubt upon the reasonableness of an agency's conclusions. *See Greenpeace Action*, 14 F.3d at 1334 (holding that a

party may not establish controversy post hoc, when at the time of the agency's action no controversy existed). This procedural requirement is a natural consequence of the fact that "NEPA exists to ensure a *process*, not to ensure any particular result." *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 960 (9th Cir.2003) (quotation omitted and emphasis in original). The controversy requirement is two-fold: the plaintiffs must show that there was a "substantial dispute" about the agency's actions, and that this dispute raised "substantial questions" about the validity of the actions. *Pub. Citizen*, 316 F.3d at 1027. "An outpouring of public protest" has been held to satisfy the requirement of "substantial dispute." *Id.* NEPA then places the burden on the agency to come forward with a "well reasoned explanation" demonstrating why those responses do not suffice to create a public controversy. *Nat'l Parks*, 241 F.3d at 736.

▮ Here, the administrative record does not clearly evidence an "outpouring of public protest." Rather, the Corps received comments from only five sources: the EPA, Stanislaus County, the Service, and two neighboring landowners. Here, only the EPA and the Service opposed the proposed action.[9] *Cf. Pub. Citizen*, 316 F.3d at 1027 (over 90 percent of the comments opposed the proposed agency action); *Greenpeace Action*, 14 F.3d at 1334 (over 85 percent of the public comments opposed the proposed agency action). Nonetheless, given the agencies' expertise in environmental issues, the court considers that the first requirement has been met.

The substance of the EPA and the Service's comments satisfy the requirement of "substantial questions" of the validity of

the proposed action because the negative comments offered real criticism of the Corps's permit. The EPA "strongly" objected to the project, expressing concern that: (1) an EIS should be prepared for the entire Project; (2) the cumulative impacts were not adequately addressed; (3) the proposed mitigation was insufficient; (4) that the development would result in significant degradation of the aquatic environment; and (5) the analysis of alternatives to the project was inadequate. (*See* A.R. 02121; A.R. 02560–2565; A.R. 03619–20). The Service responded to the Public Notice with two letters in October 1998, reiterating the concerns expressed by the EPA, and additionally (1) advising that Diablo Grande had yet to comply with the terms of the Biological Opinion and expressing concern regarding excess take of the kit fox, (A.R.07158); and (2) instructing the Corps to conduct "appropriate surveys" and initiate consultation on the threatened California red-legged frog, "if the frog or any other special status species is identified to be present on the development site." (A.R.02264).

In its EA, the Corps not only described each of these concerns (A.R. 05377–78), but addressed each one, providing reasons as to why it declined to act on the Service's comments, and thus, why no controversy regarding the issues brought out by the agency's comments existed.

With respect to the treatment of the Project in its entirety in assessing impacts to the environment, the Corps noted that "Phases 2–5, currently, do not have local entitlements and development of those phases may occur over the next 25 to 30 years or not at all. Development of these phases cannot be considered to be reason-

---

9. The comment of Diane G. Kindermann on behalf of neighboring landowners stated that the landowners make "recommendations for

either denial of the requested ... Permit, or conditioning of the new Permit to mitigate past and future impacts." (A.R.02257).

ably foreseeable and their impacts cannot be evaluated." (A.R.05379).

The Corps described the cumulative effects of the proposed project as resulting in "inadequate buffering of creek corridors, introduction of non-native species, and other effects of urbanization." (A.R. 05375). However, the Corps also explained that the cumulative impacts from implementation of the Phase 1 area would be "relatively insignificant if mitigated." (A.R.05376).

In response to concerns about the development of mitigation plans, the Corps stated that Diablo Grande modified the project to incorporate two additional preserve areas in order to address secondary and indirect affects to United States waters. The first is a 1230 acre area containing 15.5 acres of waters, and the second is a 1035 acre area containing a portion of Orestimba Creek. (A.R.05380). These two additional areas are in addition to the construction of 15.21 acres of waters to mitigate for the loss of 9.08 acres of waters at the Phase 1 site. (A.R.05353–57)

As discussed earlier, the ASACW reviewed the project following the EPA's request to elevate discussions of its concerns with the proposed project, and determined that the EPA's concerns were adequately addressed. Moreover, the EPA and Diablo Grande subsequently reached an agreement on a mitigation plan. The EPA stated that "protection of the Additional Mitigation Lands (the "Sawtooth" area) as a condition of the Permit in combination with the mitigation currently included in the Permit will fully and completely compensate for all direct, indirect and cumulative impacts to aquatic resources associated with the Permit." (A.R.05270). Thus, during the review process, Diablo Grande was able to address potential effects on United States waters to the satisfaction of the EPA. *See Wetlands Action*, 222 F.3d at 1122 (determining that the Corps did not commit a clear error in judgment when it decided that its action was not controversial where the Corps was able to address the concerns of the other federal resource agencies during the two year review process). As the administrative record evidences no EPA objections after the mitigation agreement, it appears that the EPA withdrew its objection to the permit.

In response to concerns regarding analysis of project alternatives, the Corps stated in the EA that Diablo Grande provided the information on alternatives requested by the EPA and the Service.[10] (A.R. 05379; *see also* A.R. 02560–71). The EPA disagreed with this analysis of alternatives. (A.R.02560–71). However, the Corps has discretion to rely on the reasonable opinions of its own qualified experts. *Greenpeace Action*, 14 F.3d at 1332. In the EA, the Corps explained that Diablo Grande considered four locations for the Project, but dismissed each on factors such as being located in multiple counties, topography, elevation, and proximity to transportation corridors. The Corps further stated that, using the information provided by Diablo Grande, it determined that one of the alternative locations could have resulted in more impact to the environment. (A.R. 05357–58; 05379); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 834–35 (9th Cir.1986) ("An EA may be based entirely upon information supplied by the applicant and indeed may be prepared by an outside consulting firm"). The Corps stated that it considered other project designs for both the Phase 1 development

10. Although the EA states that this analysis, *404(b)(1) Alternatives Analysis, Oak Flat Village, Stanislaus County, California* (March 8, 1999) at 15–21, is included as Appendix 2 to the EA, such an appendix does not appear to be attached to the EA in the administrative record.

and the cut-across road, including small incremental reductions in fill and project realignments. Three alternative alignments were considered for the cut-across road, each dismissed based on failing to meet county safety standards, increased costs, and conflicts with existing facilities. (A.R.05357–58, 05379–80). Finally, in response to the agency comments, further modifications were made to the project that resulted in increased avoidance. (A.R.05380).

The Corps demonstrated that no controversy existed with regard to Diablo Grande's compliance with the Biological Opinion because Diablo Grande fulfilled its terms and conditions. (A.R.05368). In demonstrating that no controversy existed with regard to impact on the red-legged frog, the Corps explained that it complied with the Service's request for surveys on the presence of the red-legged frog at the project site. Although the Corps noted that red-legged frogs were observed in the general vicinity of the project site, the surveys found no red-legged frogs at the site. (A.R. 05369; 05380).

Plaintiffs also appear to suggest that the state litigation, brought under the California Environmental Quality Act,

demonstrates ongoing public controversy. However, it is not clear that the state litigation concerned the "size, nature and effect" of the proposed project, but instead addressed the adequacy of the local procedures followed in obtaining the Supplemental Environmental Impact Report approved in 1998. (A.R.04848). Also, any controversy represented by the state litigation would also have been resolved by the state litigation.

Accordingly, the court finds that the Corps was not arbitrary and capricious in determining that no controversy existed for the purposes of NEPA.[11]

### (iii) *Cumulative Impacts and Connected Actions*

▋ Plaintiffs argue that Phases 2–5 of the Project will have cumulative impacts on the permitted development of Phase 1 and that the EA is inadequate because it does not address these cumulative impacts. Alternatively, plaintiffs argue that Phases 1–5 of the entire Project are "connected actions" that must be evaluated together in a single EA; thus, the EA is inadequate because it does not address these connected actions. Because analysis to determine

---

**11.** The court notes that plaintiffs have directed the court to correspondences of two United States Senators regarding the Corps's review of the permit application. However, one letter was not directed to the Corps, but rather was a response by the EPA to Senator Feinstein's inquiry regarding the Project; the other letter was written by Senator Max Cleland to the Corps on behalf of Donald Panoz, President of Diablo Grande, seeking to expedite review, and makes no mention of the potential environmental impacts of the project. The fact that United States Senators have expressed an interest in the proposed action does not indicate presence of a public controversy regarding the potential impact of the proposed action.

Steve Burke, spokesperson for plaintiff POW, states that he made his concerns regarding the permit known to the EPA and

Service. Thus, it would appear that any of his concerns would have been reflected in the Service's and the EPA's comments. Burke did not submit any comments during the public comment period. (Burke Decl. in Support of Pls.' Reply ¶¶ 4–5). Lydia Miller, President of the Board of Directors of plaintiff Center, states that although the Corps states that a copy of the Public Notice of the permit application was provided to the Center, she has no recollection of receiving a copy. Like Burke, Miller states that she stayed actively involved in objecting to the project during the state litigation and by monitoring the EPA and Service response to the public notice. (Miller Decl. in Support of Pls.' Reply ¶¶ 4–7). However, neither Burke's nor Miller's objections were made known directly to the Corps during the public comment period and do not appear in the administrative record.

if an EA must include "cumulative impacts" overlaps heavily with the analysis for inclusion of "connected actions," the court addresses both together. *See, e.g., Wetlands Action*, 222 F.3d at 1118–19; *Save the Yaak Comm. v. Block*, 840 F.2d 714, 719–21 (9th Cir.1988).

The CEQ regulations provide that an agency must consider "connected actions" and "cumulative actions" within a single EA. *Wetlands Action Network*, 222 F.3d at 1118 (citing 40 C.F.R. § 1508.25). A connected or cumulative action must be considered together to prevent an agency from dividing a project into multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial impact. *Id.* Actions are connected if they "[a]utomatically trigger other actions which may require environmental impact statements[,] . . . [c]annot or will not proceed unless other actions are taken previously or simultaneously [, or] . . . [a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a). Cumulative actions are those "which when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2). A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

 To determine whether an agency is required to consider multiple actions—either cumulative or connected—in a single NEPA review pursuant to the CEQ, the court applies an "independent utility" test. *Wetlands Action*, 222 F.3d at 1118. Actions have independent utility when each of the two projects would have taken place with or without the other. *Id.; see Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 580 (9th Cir.1998) (even where the second project would exacerbate the problems addressed by the proposed project, the agency did not improperly segment NEPA review by treating the proposed project alone because each had independent utility). The whole of a project must be considered together when the "dependency is such that it would be irrational, or at least unwise to undertake the first phase if subsequent phases were not also undertaken." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1285 (9th Cir.1974). In *Wetlands Action*, the court determined that the first phase of a development project that included construction of five million square feet of office space, 13,000 dwelling units, a hotel, and retail space had independent utility because it "[did] not depend upon the completion of the later phases of the project," which included the restoration of a marsh and development of a marina. *Wetlands Action*, 222 F.3d at 1119. Similarly, here, Phase 1 does not depend on the later phases of the Project such that it would be irrational to undertake Phase 1 alone. Phase 1 includes 2,000 homes, a town center, shopping center, public services, hotel and conference center, resort complex, an open space area of about 1,160 acres (including two golf courses), and a road system; it is a community unto itself.

In support of their claim that the cumulative impacts of Phases 2–5 should have been considered in the EA pertaining to development of Phase 1, plaintiffs cite *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir.1998). In *Blue Mountains*, the court determined that five related timber sales, announced simultaneously to a group of logging companies, had to be considered in a single NEPA analysis. *Id.* at 1214–16. Unlike the situation in *Blue Mountains*, here, de-

cisions regarding Phases 2–5 of the Project have yet to be made. Like the situation in *Wetlands Action,* Phases 2–5 have yet to receive the required county approvals to begin development. *Wetlands Action,* 222 F.3d at 1119. Although, in 1992, the County issued a draft Environmental Impact Report ("EIR") and approved a Specific Plan for the entire Project, approval for the Specific Plan for Phases 2–5 were rescinded following state court litigation. (*See* Diablo Grande's SUF ¶ 6; A.R. 04828). Thus, Phases 2–5 were not reasonably foreseeable. *See Wetlands Action,* 222 F.3d at 1119 (where planning decisions and authorizations for the later phases of the development had yet to be completed, the court determined that "finding that the Corps was required … to have analyzed the environmental impacts of the three phases in a single EA … would require the government to do the impractical."); *cf. Save the Yaak,* 840 F.2d at 721 (both connected and unrelated actions can result in cumulative impacts, but the actions must be reasonably foreseeable). In the EA, the Corps explained that Phases 2–5 "may occur over the next 25 to 30 years or not at all." (A.R.05379). Based on the lack of an approved Plan for Phases 2–5, it was not arbitrary and capricious for the Corps to conclude that "[d]evelopment of these phases cannot be considered to be reasonably foreseeable and their impacts cannot be evaluated." (*Id.*).

▮ Consideration of cumulative impacts requires some "quantified or detailed information;" the agency must provide a "useful analysis of the cumulative impacts of past, present, and future projects." *Kern v. United States Bureau of Land Mgmt.,* 284 F.3d 1062, 1075 (9th Cir.2002).

Here, the EA includes a description of the work done pursuant to NWPs in the past, including two golf courses, a parkway, and water pipeline. The EA also describes the proposed action, development of the Phase 1 residential areas and the cut-across road. In addition, the EA provides a detailed summary of the impacts resulting from the previous NWPs and the mitigation Diablo Grande provided for those impacts. (A.R. 05353–57). The EA also provides a section summarizing secondary and cumulative effects, in which it considered the effect of the total impacted water to-date and the entire 2300 acres affected by the project date upon completion of the Phase 1 development. (A.R.05375). Additionally, the section contains a list of all the potential cumulative impacts from the Phase 1 development.[12] (A.R.05375–76).

Accordingly, the court finds that the Corps was not arbitrary and capricious in determining that Phases 2–5 need not be considered in the EA, nor in its consideration of cumulative effects.

### (iv) *Consideration of Endangered and Threatened Species*

▮ Plaintiffs argue that the Corps's discussion in the EA of the potential impact to the kit fox and the red-legged frog cannot support the conclusion that the project will not jeopardize any federally listed threatened or endangered species. (A.R. 05381). The CEQ regulations mandate that an agency evaluate "[t]he degree to which the action may adversely affect an endangered or threatened species" when determining whether an action will significantly affect the environment. 40 C.F.R § 1508.27(b)(9).

---

**12.** The list includes, *inter alia:* loss of agricultural land and open space; maintenance of levels of services such as wastewater treatment, solid waste disposal, drainage facilities, increase use of energy and resources, air emissions, loss of rural character, incremental increases in effects of geological hazards, potential loss of cultural resources, and loss of foraging habitat for wildlife species. (A.R. 05376).

Prior to the issuance of the permit, and as required by the ESA, the Corps initiated consultation with the Service regarding the kit fox. In response, the Service issued its Biological Opinion. (A.R.00808). Because the Service, in creating the Biological Opinion, considered the effects of the construction of the entire Project on the kit fox, the Biological Opinion encompassed consideration of the impact as a result of development of Phase 1. (A.R. 00808, 00811). In concluding that the permit would not likely jeopardize the kit fox, the Biological Opinion cited numerous surveys of Oak Flat Valley that observed no kit foxes at the project site. (A.R.00810).

The Biological Opinion permitted the take of one kit fox in the form of being harmed or killed, and determined that the number of kit fox "subject to harassment from noise, vibrations, and capture or excavation of dens and burrows to be impracticable to estimate." (A.R.00814). To be exempt under this incidental take statement, Diablo Grande was required to fulfill several terms and conditions including establishment of a conservation preserve and implementation of plans to protect and minimize the impacts of habitat loss and fragmentation to the kit fox. (A.R.00814–15). In the EA, the Corps noted that, in accordance with the Biological Opinion, Diablo Grande completed the purchase and preserve of the 125 acres of mitigation lands required and implemented the *Standardized Recommendations for Protection of the San Joaquin Fox.* (A.R.05367–68). The EA stated that Diablo Grande complied with the conditions of the Biological Opinion. (A.R.05380).

In its letter of October 8, 1998, the Service stated that it "believes that unauthorized take of [the kit fox] may be occurring as a result of the Diablo Grande project," however, the Service offered no evidence that kit fox had been observed at the project site. (A.R.07158–59). In the EA, the Corps explained that no kit foxes were observed in any of the 1991, 1992, and 1993 surveys conducted on the project site, access roads, or project vicinity. (A.R. 05367). Surveys were conducted in accordance with recommended Service methodology. Survey techniques employed included scent stations, spotlighting, ground transects, and remote camera stations. (A.R.05367). However, the EA acknowledged that two kit foxes were observed approximately five miles east of the project site, and that the project site is accessible to kit foxes. (A.R.05367–68).

Prior to the issuance of the permit, the Service only requested that the Corps conduct appropriate surveys to determine whether red-legged frogs are present at the project site; if the red-legged frog was found, the Service recommended initiation of consultation. (A.R.2264). The administrative record demonstrates that Diablo Grande completed a survey regarding the red-legged frog, the summary for which was produced in February 1999. (A.R. 02429–41; 05380). In the EA, the Corps responded to the Service's direction to identify if red-legged frogs are present on the project site, stating that "[n]o red-legged frogs were observed in the Phase 1 area or along the access roads" and noting the observations of red-legged frogs in the general vicinity of the project site. (A.R. 05369).

Accordingly, the court determines that the Corps's consideration of the possible effects on federally listed species was not arbitrary and capricious.

In conclusion, plaintiffs have failed to establish that the Corps's decision not to prepare an EIS before issuing the permit was arbitrary and capricious.

### 2. Clean Water Act

The CWA is designed to "restore and maintain the chemical, physical, and bio-

logical integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, under the section 404 permitting program, the CWA prohibits discharge of any dredged or fill material into navigable waters of the United States unless authorized by a CWA permit. 33 U.S.C § 1344. Section 404(a) authorizes the Secretary of the Army ("Army"), acting through the Corps, to issue permits for the discharge of dredged or fill material to United States waters. In reviewing each permit application, the Army must apply guidelines ("Guidelines") developed by the EPA in conjunction with the Army pursuant to section 404(b)(1) and published at 40 C.F.R. § 230. Pursuant to 33 C.F.R. § 320.4(a)(1), before issuing a permit, the Corps must engage in a "public interest review."

Plaintiffs contend that the Corps's issuance of the permit for construction of the cut-across road and development of Phase 1 was arbitrary and capricious. Plaintiffs raise three specific objections to the Corps's decision to grant the permit: (1) the Corps failed to analyze the cumulative impacts of the Project; (2) the Corps failed to give full consideration to the views of the Service; (3) the Corps failed to evaluate the impact of the Project on listed species.

### (i) Cumulative impacts

Both the Corps's own regulations, and the EPA's section 404(b) (1) Guidelines require the Corps to analyze the cumulative effects of its permitting decisions. See 33 C.F.R § 320.4(a)(1); 40 C.F.R. § 230.10(c). Pursuant to the Guidelines, no permits shall be issued that "will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). Determinations of the effects of each proposed discharge "shall include ... [c]umulative effects on the aquatic ecosystem." 40 C.F.R. § 230.11(g). "Cumulative impacts are the

changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." 40 C.F.R. § 230.11(g)(1). The Guidelines warn that the cumulative effect of piecemeal changes can result in major impairment of water resources and interfere with existing aquatic ecosystems. Id. Cumulative effects should be predicted to the extent reasonable and practical. 40 C.F.R. § 230.11(g)(2).

Plaintiffs direct the court to the same contentions they presented in arguing that the Corps violated NEPA. (Pls.' Mot. at 38). The court has already determined that the Corps adequately considered cumulative impacts of the proposed action and was not arbitrary and capricious. See supra, II(B)(1)(iii).

### (ii) Consideration of Service's Views

In deciding whether to issue a permit, Corps regulations require it to consult with the Service "with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed by the permit application." 33 C.F.R. § 320.4(c). The Corps will give the Service's views "full consideration ... in deciding on the issuance, denial, or conditioning of individual or general permits." Id. To determine whether the Corps's decision to issue the permit was arbitrary or capricious, the court looks the Service's views made known to the Corps prior to its issuance of the permit on June 20, 2001.

Because the Service's views deal primarily with the possible effects of the permit on endangered and threatened species, discussion of whether the Corps considered the Service's views overlaps with the court's analysis of plaintiffs' claim that the Corps failed to consider endangered and threatened species as required by

NEPA. *See supra*, II(B)(1)(iv). The court has already determined that the Corps adequately considered the Service's views regarding the endangered kit fox and the threatened red-legged frog by completing appropriate surveys for the both the kit fox and the red-legged frog, which found neither species at the project site, and by complying with the terms and conditions of the Biological Opinion.

Plaintiffs also contend that the Corps failed to consult with the Service and give full consideration to the Service's views that the Biological Opinion did not consider the impacts of Phase 1 or of the entire Project. However, the Service's comments to the Corps prior to the issuance of the permit do not indicate that the Service expressed concern that its consultation with the Corps was insufficient with respect to these impacts. (*See* A.R. 02261–02265; A.R. 07158–59). Moreover, the Service, in the Biological Opinion, indicated that it considered the indirect effect of the construction of the entire Project. (A.R.00808, 00811). Additionally, the Corps explained in the EA, that there is no need to consider the entire Project because "[t]he other four phases have been dropped, and currently the only development that will occur is ... Phase 1." (A.R. 05353). Therefore, the Corps's consideration of the Service's views made known prior to the issuance of the permit was not arbitrary and capricious.

### (iii) *Impact on Listed Species*

Pursuant to 40 C.F.R. § 230.10(b)(3), no discharge of dredged or fill material shall be permitted if it "[j]eopardizes the continued existence of species listed as endangered or threatened." As discussed previously, in section II(B)(1)(iv), the administrative record demonstrates that prior to the issuance of the permit, the Corps had consulted with the Service, which produced a Biological Opinion, (A.R.00808–835), concerning the kit fox stating that

"issuance of a section 404 permit to fill wetlands for construction of the access road described in this biological opinion, is not likely to jeopardize the continued existence of the San Joaquin kit fox." (A.R. 00809). Additionally, as discussed in section II(B)(1)(iv), the Corps complied with Service directions in determining that no red-legged frogs were present at the project site. Accordingly, the court determines that the Corps's issuance of the permit was not arbitrary and capricious.

### 3. *Endangered Species Act*

#### (i) *Section 7(a)(1)*

Plaintiffs contend that the Corps failed to carry out its duty under section 7(a)(1) of the ESA to conserve the endangered kit fox and the threatened red-legged frog by refusing to consult with the Service regarding the impact of Phase 1 and of the entire Project on these species before issuing Diablo Grande's permit. Under section 7(a)(1) of the ESA, all federal agencies "shall, in consultation and with the assistance of the Secretary [of the Interior], utilize their authorities [to] carry[ ] out programs for the conservation of endangered species and threatened species." 16 U.S.C. § 1536(a)(1). The term "conservation" means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3). An agency is afforded "some discretion" in its determination of how best to comply with its duty to conserve under section 7(a)(1). *See Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy*, 898 F.2d 1410, 1418 (9th Cir. 1990); *Defenders of Wildlife v. Babbitt*, 130 F.Supp.2d 121, 135 (D.D.C.2001) ("The case law is well settled that federal agencies are accorded discretion in determining

how to fulfill their § [7(a)(1) ] obligations") (quoting *Coalition for Sustainable Resources v. United States Forest Service,* 48 F.Supp.2d 1303, 1315–16 (D.Wyo.1999)).

By its terms, section 7(a)(1) applies to agency programs, not individual agency actions. *See* 16 U.S.C. § 1536(a)(1) ("programs for the conservation of endangered ... and threatened species"); *Ore. Natural Res. Council Fund v. United States Army Corps of Eng'rs,* No. 00–431–JO, 2003 WL 117999 (D.Ore. Jan. 2, 2003). A single permitting decision, authorized under the permitting program of Section 404 of the Clean Water Act, does not itself constitute a program. *See* 40 C.F.R. 230.2(1) (referring to the Corps's "regulatory program" under the Clean Water Act). Although caselaw pertaining to section 7(a)(1) is sparse, typically, the question of an agency's compliance with the conservation provisions of section 7(a)(1) arises in the context where a plaintiff proposes an alternative conservation plan or requests creation of a conservation plan, and not in the context of a particular permitting decision or individual agency action. *See, e.g., Pyramid Lake,* 898 F.2d at 1417–18; *Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d at 135; *Northwest Envtl. Advocates v. EPA,* 268 F.Supp.2d 1255, 1273 (D.Or.2003) (plaintiff alleged that the agency was required to create a conservation plan for recovery of protected species); *San Francisco Baykeeper v. United States Army Corps of Eng'rs,* 219 F.Supp.2d 1001, 1026 (N.D.Cal.2002) (the plaintiffs argued that the Corps was required to create a program protecting listed species from water discharges).

Moreover, an agency may reasonably interpret its section 7(a) (1) obligations to extend no further than engaging in conservation programs that benefit listed species.

*Northwest,* 268 F.Supp.2d at 1273. "[C]onservation plans under [Section] 7(a)(1) are 'voluntary measures that the federal agency has the discretion to undertake' and 'the [ESA] does not mandate particular actions be taken by Federal Agencies to implement [Section] 7(a)(1).' " *Strahan v. Linnon,* 967 F.Supp. 581, 596 (D.Mass.1997) (quoting 51 Fed.Reg. 19926, 19931, 19934).

The Corps points out that it has implemented a program to conserve endangered and threatened species in conjunction with its CWA Section 404 permitting program. This program is implemented through the Corps's Nationwide Permit General Condition 11, which states that "[n]o activity is authorized under any NWP if that activity is likely to jeopardize the continued existence of a threatened or endangered species ...." 33 C.F.R. § 330.4(f). General Condition 11 provides that non-federal permittees must notify the Corps District Engineer if any listed species or designated critical habitat might be affected by or is in the vicinity of their project, and cannot begin work on the permitted activity until notified by the District Engineer that ESA requirements have been satisfied. Also, as a result of formal or informal consultation with the Service, the District Engineer may add species-specific regional endangered species conditions to the permit.[13] *Id.* Accordingly, the court determines that the Corps was not arbitrary and capricious in carrying out its duties under section 7(a)(1).

(ii) *Section 7(a)(2)*

Under section 7 of the ESA, "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior] insure that any action

---

**13.** Plaintiffs have not alleged that the Corps violated section 7(a)(1) by failing to establish a conservation program.

authorized ... by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical .... [E]ach agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).[14] Section 7 of the ESA prescribes a three-step process to ensure compliance by federal agencies with the ESA's substantive provisions. The first two steps serve "a screening function to determine if the successive steps are required." *Thomas v. Peterson,* 753 F.2d 754, 763 (9th Cir.1985).

■ First, an agency proposing to take an action must inquire of the Service[15] whether any threatened or endangered species "may be present" in the area of the proposed action. *See* 16 U.S.C. § 1536(c)(1). For purposes of this section, "agency action" means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies;" these actions include those "directly or indirectly causing modifications to the. land [or] water." 50 C.F.R. § 402.02.

If the answer to the first inquiry is affirmative, "the agency must prepare a 'biological assessment' to determine whether such species 'is likely to be affected by the action.'" *Thomas,* 753 F.2d at 763 (quoting 16 U.S.C. § 1536(c)(1)). A biological assessment "shall evaluate the potential effects of the action on the listed and proposed species and ... determine whether any such species or habitat are likely to be adversely affected by the ac-

tion and is used in determining whether formal consultation or a conference is necessary." 50 C.F.R. § 402.12.

■ Third, if the agency determines, based on its biological assessment, that the action it proposes to take "may affect" a threatened or endangered species, a "formal consultation [with the Service] is required." 50 C.F.R. § 402.14(a); *see Natural Res. Def. Council v. Houston,* 146 F.3d 1118, 1125 (9th Cir.1998). A formal consultation is excused where (1) an agency determines, as a result of its biological assessment or as a result of informal consultation with the Service, that the proposed action is not likely to adversely affect any listed species or critical habitat, *and* (2) the regional director of the Service, or authorized representative, provides a written concurrence. *Houston,* 146 F.3d at 1126; *Tinoqui–Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. United States Dep't of Energy,* 232 F.3d 1300, 1306 (9th Cir.2000); 50 C.F.R. 402.14(b). Also, if the agency determines that a particular action will have no effect on an endangered or threatened species, the formal consultation requirements are not triggered. *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1054 n. 8 (9th Cir. 1994).

■ The formal consultation results in a biological opinion issued by the Service evaluating the nature and extent of the effect on threatened or endangered. *See Houston,* 146 F.3d at 1125. If the biological opinion concludes that the proposed action is likely to jeopardize a protected

---

**14.** "Jeopardize the continued existence of" means to engage in an action that reasonably would be expected, directly or indirectly, to appreciably reduce the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers or distribution of that species. 33 C.F.R. § 402.02.

**15.** The text of the statute actually names the Secretary of the Interior. However, under 50 C.F.R. § 402.01(b), the Secretary of the Interior has delegated authority to the Service for administering this section of the ESA. The federal agency is directed to contact the Service for all species not under the jurisdiction of the National Marine Fisheries Service.

species, the agency must modify its proposal. *Id.* If the biological opinion concludes that the proposed activity is not likely to jeopardize a threatened or endangered species, then the proposed action is permitted. *Envtl. Prot. Info. Ctr. ("EPIC") v. Simpson Timber Co.,* 255 F.3d 1073, 1075 (9th Cir.2001). If the Service, in its biological opinion, finds no jeopardy to protected species, it must provide the agency with a statement indicating any incidental take[16] of the species resulting from the proposed action and setting forth reasonable and prudent measures to minimize the take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

The duty to reinitiate consultation lies with both the action agency (here, the Corps) and the consultation agency (here, the Service). Reinitiation of consultation requires the Service to issue a new biological opinion before the agency action may continue. *Id.* Although, in the instant action, the Service has requested reinitiation of consultation, (A.R. 05838–51; 05886–91; 05968–75; 06177–84), "the ESA does not give the [Service] the power to order other agencies to comply with its requests or to veto their decisions." *Sierra Club v. Marsh,* 816 F.2d at 1386.

However, consultation must be reinitiated under certain circumstances. An agency is required to reinitiate consultation:

(a) If the amount or extent of taking specified in the incidental take statement is exceeded;

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

(d) If a new species is listed or critical habitat designated that may be affected by the identified action. *EPIC,* 255 F.3d at 1076 (citing 50 C.F.R. § 402.16).

Before determining if reinitiation of consultation is required, the court must address the threshold question of whether the action agency retained discretionary involvement or control over the action. 50 C.F.R. § 402.16. To reinitiate consultation, the action agency must retain discretionary control that can inure to the benefit of a protected species. *See EPIC v. Simpson Timber Co.,* 255 F.3d 1073 (9th Cir.2001) (determining that the agency did not retain discretionary control over newly listed species). Where no discretion to act is retained, consultation would be a meaningless exercise. *Sierra Club v. Babbitt,* 65 F.3d 1502, 1509 (9th Cir.1995).

The permit issued by the Corps to Diablo Grande on specifically provides for ongoing discretionary control by the Corps over the permit. The Corps stated that "[t]his office may reevaluate its decision on this permit at any time the circumstances warrant." (A.R.05302). "Circumstances that could require a reevaluation include but are not limited to . . . [s]ignificant new information [that] surfaces which this office did not consider in reaching the original public interest decision." (*Id.*). In *Pacific Rivers Council,* 30 F.3d at 1053, the court determined that the agency's Land Resource Management Plans had an ongoing and long-lasting effect even after adoption, and thus represented ongoing agency action. Similarly, here, by its terms, the permit allows the Corps ongoing involvement; the Corps has retained discretion over Diablo Grande's activities.

---

16. "Incidental take" refers to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity. 50 C.F.R. § 402.02.

In *Sierra Club v. Babbitt*, 65 F.3d at 1509, the court determined that the agency did not retain the discretion required for reinitiation of consultation where it retained discretion limited only to three instances, none of which related to protected species. In *EPIC*, 255 F.3d at 1081, where the grounds for reinitiation were the protection of a newly listed species, the court held that the agency did not have the required discretionary control where it retained some discretion to accommodate other protected species listed at the time the permit was issued, but none related to newly listed species. However, here the Corps has retained almost unbound discretion limited to "any time the circumstances warrant." (A.R.05302).

Moreover, the permit contemplates that reevaluation may result in a determination that the suspension, modification, and revocation procedures contained in 33 C.F.R. § 325.7 are appropriate. (*Id.*). The procedures outlined in 33 C.F.R. § 325.7 may be implemented where the "public interest" requires such suspension, modification, or revocation. As defined by 33 C.F.R. § 320.4(a) "public interest review" encompasses "fish and wildlife values." In *EPIC*, the court determined that an interpretation of a broad agency regulation allowing the agency to "amend any permit for just cause at any time during its term" as giving the agency discretion to consider impacts on newly listed species would mean that discretionary control required by 50 C.F.R. § 402.16 is always reserved. *EPIC*, 255 F.3d at 1082. However, in the instant case, the relevant agency regulation specifically contemplates discretion to amend a permit based on wildlife considerations.

Having determined that the Corps maintains discretionary authority sufficient to permit reinitiation of consultation with the Service pursuant to 50 C.F.R. § 402.16, the court now turns to the four circumstances in which the agency is required to reinitiate consultation:

### (a) Take Exceeds that Allowed by the Incidental Take Statement

Plaintiffs argue that reinitiation of consultation is required because the take limit for the kit fox may have been exceeded. The Biological Opinion allowed take of one fox in the form of being harmed or killed. (A.R.00814). "Incidental Take Statements set forth a 'trigger' that, when reached, results in an unacceptable level of take ... requiring the parties to reinitiate consultation." *Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife*, 273 F.3d 1229, 1249 (9th Cir.2001) (determining that "speculative evidence, without more" does not demonstrate a taking as defined by sections 7 and 9 of the ESA).

In its October 15, 2002 letter to the Corps, the Service stated that it "is concerned that the proposed cut-across road and the Phase 1 Development Area of the project have exceeded the incidental take coverage for the kit fox permitted in the 1995 biological opinion because the preconstruction surveys identified 17 potential kit fox dens at the cut-across road site and 33 potential kit fox dens at the Phase 1 Development site." (A.R.06401). However, this statement merely suggests and does not demonstrate, as required by 50 C.F.R. § 402.16(a), that the "trigger" set by the incidental take statement in the Biological Opinion has been exceeded. *See Arizona Cattle*, 273 F.3d at 1244 ("[a]lthough habitat modification resulting in actual killing or injury may constitute a taking, the [Service] has presented only speculative evidence that habitat modification may impact" the endangered species; the court determined that this was insufficient to constitute a taking as defined by section 7).

The administrative record provides additional support for the claim that no take in excess of that allowed by the incidental take statement has occurred. The administrative record demonstrates that the pre-construction surveys conducted in compliance with the Biological Opinion revealed no signs of kit foxes within 300 feet of the proposed cut-across road. (A.R.06011). In addition, the administrative record demonstrates that take-avoidance measures were undertaken prior to the start of construction. The potential kit fox dens identified by pre-construction surveys were monitored for kit fox activity; no activity was found. As allowed by the Biological Opinion, the dens were then excavated and collapsed to avoid entrapment and to ensure that kit foxes could not re-enter during the construction period. (A.R. 06445; 00815) ("[t]he potential for inadvertent entrapment of ... kit foxes in their dens shall be minimized"); 00822 ("[l]imited destruction of kit fox dens may therefore be permitted if avoidance is not a reasonable alternative"). Accordingly, the court determines that the Corps was not arbitrary and capricious in determining that reinitiation of consultation was not warranted under 50 C.F.R. § 402.16(a).

(b) *New Information*

■■■ Plaintiffs also argue that the administrative record demonstrates new information that reveals previously unconsidered effects of the permitted action that may affect the kit fox. Pursuant to 50 C.F.R. § 402.16(b), "if new information reveals effects of the action that may affect listed species ... in a manner or to an extent not previously considered," reinitiation of consultation is required. *Reservation Ranch v. United States*, 39 Fed.Cl. 696, 714 (1997) ("The regulatory requirement to reinitiate consultation is implicated where the federal agency is proposing to act in the face of information indicating a possibility of harm to the species not

considered in a previous consultation") (citing *Sierra Club v. Marsh*, 816 F.2d 1376). Publication of a later report on the relevant listed species does not automatically constitute revelation of new information. *See Wyo. Outdoor Council v. Bosworth*, 284 F.Supp.2d 81, 93–95 (D.D.C.2003) (concluding that information about the rarity and importance of the spring grizzly bear habitat did not trigger reinitiation because the Service was already aware of the importance of the area during the consultation); *Gerber v. Babbitt*, 146 F.Supp.2d 1, 5 (D.D.C.2001) (concluding that information regarding development of a subdivision near a mitigation site did not trigger reinitiation because the Service knew of the development). Confirmation of the importance of previously recognized information does not trigger reinitation of consultation. *See Wyo. Outdoor*, 284 F.Supp.2d at 93–95.

Plaintiffs argue that the 1998 kit fox Recovery Plan, published in 1998, three years after the Biological Opinion, constitutes new information. (A.R.02165–02178). Specifically, the Service's May 31, 2002 letter suggests that it requested reinitiation of consultation based, in part, on the fact that the construction authorized by the permit "lies partially within an important kit fox movement corridor as identified in the 1998 Recovery Plan." (A.R. 05840). However, the Biological Opinion acknowledged that "[k]it foxes may follow the drainages from outlying areas of the kit fox range into Diablo Grande and down Salado Creek to the grasslands by Interstate Highway 5." Thus, the construction of the entire Project "will prevent kit foxes from using these potential travel corridors, thereby further fragmenting kit fox populations." (A.R.00811). In the Biological Opinion, the Service also explained that construction "may result in the temporary disturbance of a potential movement corridor, which may hinder dispersal of kit

foxes. The construction of the road and water pipeline may create a temporary barrier to dispersal of kit foxes between Del Puerto Canyon · and the grasslands adjacent to Interstate Highway 5." (A.R. 00812).

In its May 31, 2002 and June 12, 2002 letters, the Service also suggests reinitiation is necessary because of sightings of the kit fox within 10 miles of the proposed project location. (A.R.05840, 05970). While this information is not specifically noted in the Biological Opinion, it merely confirms the Biological Opinion's statement that "[t]here have been kit fox sightings within five miles of Oak Flat Valley Road and Diablo Grande." (A.R.00810). Thus, the Biological Survey, in determining that the permit would not likely jeopardize the kit fox, took into consideration the occurrence of kit fox in the project vicinity.

Thus, the administrative record demonstrates that the Service, in ·the Biological Opinion, recognized and took into account the threats to the kit fox that were later compiled in its Recovery Plan. Accordingly, plaintiffs have not met their burden of showing that this information reveals effects on the kit fox that are different or more extensive than those previously considered by the Service.

### (c) Modification of Action

Plaintiffs argue that reinitiation of consultation is necessary because the Biological Opinion was limited to the impacts of the cut-across road and to the kit fox, and did not include consultation on impacts to the remainder of either Phase 1 or Phases 2–5 of the Project. Under 50 C.F.R. § 402.16(c), if the identified action is subsequently modified in a ‘ manner that causes an effect to the listed species ... that was not considered in the biological opinion, reinitiation of consultation is required. The magnitude of and importance of the modification must be taken into account in determining whether reinitiation of consultation is necessary. See Sierra Club v. Marsh, 816 F.2d at 1381–88 (holding reinitiation of consultation was required given failure to acquire mitigation lands and approval of increased development that was likely to jeopardize the continued existence of protected species).

Although the Corps requested formal consultation on the issuance of a permit for fill resulting from Diablo Grande's construction of a cut-across road, the Corps permit authorized construction not only for a cut-across road, but for the development of Phase 1 residential areas. (A.R. 00808; 05297). However, the administrative record demonstrates that the Biological Opinion accounted for modifications in the actions for which the consultation was made. The kit fox surveys were conducted for Oak Flat Valley, the Phase 1 site, as well as the cut-across road site. (A.R.00810). The Service indicated that its Biological Opinion was based in part on planning documents for both the Project and Phase 1, including: the "Diablo Grande Specific Plan Draft Environmental Impact Report (August 31, 1992), the Final Environmental Impact Report: Diablo Grande Specific Plan (June 15, 1993), San Joaquin Kit Fox Assessment Diablo Grande Phase 1 Site and the Oak Flat Road Alignment Stanislaus County, California (February 21, 1991), Habitat Management Plan for the Diablo Grande Specific Plan and Phase 1 preliminary Development Plan (March 31, 1994), and San Joaquin Kit Fox Assessment Oak Flat Valley Portion Diablo Grande Phase 1 Site Stanislaus County (January 20, 1994)." (A.R.00808–09). In considering the effects of the proposed cut-across road, the Service also reviewed indirect effects from the "estimated 20 year build-out for five different projects," including Phase 1. (Id. at 00811).

The Service stated that it "is especially concerned with indirect effects of the proposed project" and provided as an example, the increased mortality of the kit fox due to increased traffic through the kit fox's movement corridor. (A.R.05841). However, the Biological Opinion expressly considered this indirect effect, noting that increased traffic "will increase the likelihood of kit fox being injured or killed from vehicle strikes." (A.R.00813).

Also, in its letter of October 15, 2002, the Service noted that in 1995, it had anticipated that approximately 42 acres of habitat would be adversely affected by the cut-across road, but based on an August 2002 site visit, the Service estimated that the construction resulted in adverse effects to the kit fox "appreciably greater than 42 acres." (A.R.06401). However, the ESA does not require that every minor project modification compel the action agency to reinitiate the consultation process. *Sierra Club v. Marsh*, 816 F.2d at 1388 ("[E]very modification of or uncertainty in a complex and lengthy project [does not] require[ ] the action agency to stop and reinitiate consultation").

#### (d) *New Species Listed*

■■■ Plaintiffs argue that the listing of the red-legged frog as a threatened species after the completion of the Biological Opinion necessitates reinitiation of consultation. Under 50 C.F.R. § 402.16(d), reinitiation is required "[i]f a new species is listed ... that may be affected by the identified action." *See Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F.Supp.2d 1137 (W.D.Wash.2000) (holding that reinitiation of consultation was required where the listing of the Steller sea lion as endangered came after the issuance of the biological opinions). The Service listed the red-legged frog as a threatened species in 1996, after the 1995 Biological Opinion was completed. 61 Fed.Reg. 25813 (May 23, 1996).

*Nat'l Wildlife Fed'n v. Coleman*, 529 F.2d 359, 371 (5th Cir.1976) and *Sierra Club v. Froehlke*, 534 F.2d 1289, 1303–04 (8th Cir.1976), cited by defendants for the proposition that once an agency has had "meaningful consultation" concerning actions that may affect an endangered species the final decision of whether or not to proceed with the action lies with the agency itself, are inapplicable here because no consultation as to the effects of the proposed action on the red-legged frog occurred.

As discussed in section II(B)(3)(ii), the ESA establishes a three step process to determine whether a formal consultation is necessary. This duty to consult is ongoing. *See Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1445 (9th Cir.1992); 50 C.F.R. § 402.16. In the case where a new species is listed, the action agency is placed in the same position as it is when it determines for the first time whether formal consultation is necessary. In both situations, the Service has yet to evaluate the nature and extent of the effect of the proposed action on threatened or endangered species.

Here, there is no need for the Corps to engage in the first step, the inquiry with the Service regarding whether threatened or endangered species "may be present" in the area of the proposed site; the Service has repeatedly notified the Corps that it believes red-legged frogs are located near the proposed project. (*See, e.g.*, A.R. 05839; 06466). Thus, the Corps must continue to the next step and prepare a biological assessment to determine if the red-legged frog is likely to be affected by the proposed action. *Thomas*, 753 F.2d at 763 (quoting 16 U.S.C. § 1536(c)(1)); *see Mt. Graham*, 954 F.2d at 1445 (agency prepared a new biological assessment to reinitiate formal consultation); *Southwest Ctr. for Biological Diversity v. Carroll*, 182

F.Supp.2d 944, 949 (C.D.Cal.2001) (agency prepared a biological assessment in preparation for reinitiation of consultation). "The contents of a biological assessment are at the discretion of the Federal agency;" the agency may consider, "[t]he results of an on-site inspection of the area affected by the action to determine if listed or proposed species are present . . . ." 50 C.F.R. § 402.12(f)(1). An agency may prepare the biological assessment "in cooperation with the Service." 50 C.F.R. § 402.12(b).

The Corps determined that the proposed project would have "no effect" on the red-legged frog. (A.R. 06225–26; *See also* A.R. 06400–01). No formal consultation is necessary where the agency determines that the proposed action will have "no effect" on an endangered or threatened species. *Southwest Ctr. for Biological Diversity v. United States Forest Service*, 100 F.3d 1443, 1447–48 (9th Cir.1996); *Pacific Rivers Council*, 30 F.3d at 1054 n. 8; 50 C.F.R. § 402.14(a). Because the "no effect" decision is the agency's to make, the decision to consult formally with the Service, is the agency's decision as well, not the Service's. Thus, unless the Corps's determination of "no effect" was arbitrary and capricious, the Corps need not reinitiate consultation.

Here, the Corps has determined that, based on the surveys submitted by Diablo Grande, although habitats with characteristics suitable for the red-legged frog appear to exist at the Phase 1 site, no red-legged frogs were present at the Phase 1 site. (A.R. 06225–26; 02429–40). As a general rule, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Nat'l Wildlife Fed'n v. Babbitt*, 128 F.Supp.2d 1274, 1300 (E.D.Cal.2000) (quoting *Aluminum Co. of Amer. v. Adm'r, Bonneville Power*

*Admin.*, 175 F.3d 1156, 1162 (9th Cir. 1999)). The Corps's decision to rely on Diablo Grande's surveys is entitled to deference. *See Marsh v. Ore. Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (agency has discretion to select among competing expert opinions). In *Sierra Club v. Marsh*, the Ninth Circuit accorded some weight, in applying 50 C.F.R. § 402.16(b) (the regulations concerning reinitiation of consultation given new information), to the "more appropriate expertise" of the Service, given that it "is primarily responsible for protecting endangered species and it drafted the regulations at issue here." *Sierra Club v. Marsh*, 816 F.2d at 1388. However, *Sierra Club v. Marsh* is distinguishable from the present case because in that case, there was no dispute that a previously planned transfer of land had not occurred and that failure to obtain the land would jeopardize a listed species. Here, the Corps and the Service dispute the permit's effect on the red-legged frog.

The Corps based its "no effect" decision on red-legged frog surveys performed for Diablo Grande. (A.R.06226). In 1993, the Phase 1 site was surveyed for, *inter alia*, red-legged frogs; no red-legged frogs were found. (*See* A.R. 02437). Later, 1999 surveys done by Diablo Grande were "conducted according to the protocol outlined in the [Service's] Guidance on Site Assessment and Field Surveys for California Red-legged Frogs (USFWS, 1997)," and included two daytime and nighttime spotlight surveys on all portions of the Phase 1 site with potential to support the red-legged frog, including a portion of Salado Creek and one of its tributaries, former stockponds, and golf course ponds. (A.R.02433, 02438). The daytime surveys included "walking in and along the creek and pond edges examining all banks, exposed root systems and other potential refugia for adult frogs resting or entering

the water when disturbed. The ponds and slow moving portions of the creek were also searched for the presence of red-legged frog tadpoles swimming ... or resting on the bottom." (A.R.02438). Nighttime survey methods included examining all potential habitat with headlamps and flashlights searching for resting adult frogs or their eyeshine. (*Id.*).

The Service has maintained that red-legged frogs have been observed immediately north of the Phase 1 site and the cut-across road in Del Puerto Creek, the Orestimba Creek drainage (located partially within Diablo Grande property in the south). (A.R.06402). The Service has also advised the Corps that known red-legged frog populations are located southwest of Diablo Grande, and as red-legged frogs are known to migrate two miles without regard to topography or vegetation types, the known populations in the nearby creeks may use upland areas at the cut-across road and Phase 1 site. (*Id.*).[17] Given this information, the Service concluded that "alteration of habitat in the Phase 1 Development Area and the cut-across road likely will result in take of the red-legged frog." (*Id.*). In addressing the findings of the Diablo Grande surveys, the Service stated that the 1993 surveys failed to use Service protocols and the 1998 survey was conducted in late October, when Salado Creek was dry.[18]

However, the Service itself directed the Corps's procedure in arriving at the "no effect" determination. In its October 2, 1998 letter, the Service instructed that "[a]fter completion of appropriate surveys, the Corps should initiate consultation on the ... red-legged frog ... if the frog or any other special status species is identified to be present within the project site." (A.R.02264). The Corps complied with the Service's instructions; a survey for red-legged frogs on the at the Phase 1 and the cut-across road sites was conducted. (A.R. 02433). The survey, conducted according to Service protocols, found no red-legged frogs at the project site. The fact that this survey was provided by Diablo Grande does not mean the Corps was not entitled to rely on it. *Cf. Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 955–56 (9th Cir.2003) (conservation plan agreed upon by applicant and action agency constituted the best evidence available for the Service to use in evaluating impact). Thus, in accordance with the Service's directions, the Corps determined no consultation was required regarding the red-legged frog. By its letter of October 4, 2002, the Corps made clear to the Service that it had made a "no effect" determination based on the survey results. (A.R. 06225–26; *see also* A.R. 06401).

Although the Service criticizes the survey as having been performed when Salado Creek was dry, it appears from the administrative record that the survey was conducted in accordance with the Service's own protocol. Also, the Service's criticism is undermined by the description of the surveyors' methodology, in which they explain that the slow-moving portions of the creek were searched for red-legged frog tadpoles. Thus, the court determines the Corps's "no effect" determination is not "so implausible that it could not be as-

---

**17.** These appear to be observations different from those of United States Geological Survey biologist, Dr. Gary Fellers, who placed red-legged frogs 10 miles to the south and 20 miles northwest of the project site. (*See* Pls.' Reply at 29). Defendants argue that Fellers's observations did not demonstrate that red-legged frogs were present at the project site

as the red-legged frog typically only migrate up to two miles, not ten.

**18.** The Service refers to October 1998 surveys. (A.R.06402). However, the summary of the latest Diablo Grande survey, dated February 1999, does not indicate when the surveys were actually done. (A.R.02429–2441).

cribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856. "While the administrative record reflects disagreement in the opinions and recommendations of various federal agencies . . . the [action agency] was entitled to rely on the opinions and recommendations of its own experts." *Southwest Ctr. for Biological Diversity v. U.S. Forest Service*, 100 F.3d at 1449.

Accordingly, the court determines that the Corps was not arbitrary and capricious in determining that consultation concerning the red-legged frog was unnecessary.

### (iii) *Section 9*

Plaintiffs claim that the Corps violated section 9 of the ESA by taking the kit fox and the red-legged frog. Section 9 of the ESA makes it unlawful to "take" a species listed as endangered or threatened. *See* 16 U.S.C. § 1538(a)(1)(B).

However, the Service may exempt federal agencies from section 9's prohibition on takings. Section 7(b)(4) of the ESA provides that, after consultation, the Service can authorize taking "incidental to the agency action" in an incidental take statement attached to the final biological opinion. *See* 16 U.S.C. § 1536(b)(4); 16 U.S.C. § 1536(*o*)(2). Under 16 U.S.C § 1536(*o*)(2), "any compliance with the terms and conditions specified in a written statement . . . shall not be considered to be a prohibited taking of the species concerned." Here, the Biological Opinion's incidental take statement allowed the incidental take of one kit fox during the construction of the cut-across road. (A.R. 00814).

"Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The Department of the Interior has promulgated a regulation further defining "harm" and "harass." *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 924 (9th Cir. 1999). "Harm" means an act which actually kills or injures wildlife. *Id.* "Harm" may also include significant habitat modification or degradation that actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering. *Id.* Habitat modification does not constitute harm unless it "actually kills or injures wildlife." *Babbitt v. Sweet Home Chapter of Communities for a Great Ore.*, 515 U.S. 687, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (upholding the Department of Interior's definition of harm). In *Sweet Home*, the Court emphasized that "every term in the regulation's definition of 'harm' is subservient to the phrase 'an act which actually kills or injures wildlife.'" *Id.* at 700 n. 13, 115 S.Ct. 2407.

However, where plaintiffs seek issuance of an injunction under section 9 of the ESA, the Ninth Circuit has required only a "reasonably certain threat of imminent harm to a protected species." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066 (9th Cir.1996). In *Marbled*, the Ninth Circuit determined that an injunction may issue even where death or injury of a protected species has yet to occur. *See id.* at 1065. Thus, harm includes the threat of future harm. *Id.* at 1067. In *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir.2000), the Ninth Circuit interpreted the "reasonably certain" standard to mean that "that [the defendant's] actions would result in an unlawful 'take:'" that "the proposed construction would harm an [endangered or threatened animal] by killing or injuring it."

Here, plaintiffs seek an injunction. Plaintiffs claim that the Corps and Diablo Grande have violated section 9(1) to the extent the take limit for the kit fox has been exceeded at the cut-across road con-

struction site; (2) to the extent any kit fox has been taken on the Project land other than the cut-across road given the absence of an incidental take statement regarding the impacts on the kit fox on areas other than the cut-across road; and (3) to the extent any red-legged frogs have been taken given the absence of an incidental take statement concerning red-legged frogs.

In the instant case, where the plaintiffs allege injury resulting from the incidental take statement of the Biological Opinion, produced pursuant to section 7 of the ESA, the allegations of an agency's section 9 violations are properly reviewed based on the administrative record and under the arbitrary and capricious standard of review. *See Sierra Club v. Glickman,* 67 F.3d 90, 95–96 (5th Cir.1995); *cf. Swan View Coalition, Inc. v. Turner,* 824 F.Supp. 923, 937 (D.Mont.1992). In their claim against Diablo Grande, the plaintiffs have the burden of proving by a preponderance that the proposed construction would harm an endangered or threatened animal by killing or injuring it. *Bernal,* 204 F.3d at 925. Because plaintiffs have not produced additional evidence for this issue, but instead rely on the administrative record to establish their section 9 claim against Diablo Grande, the court treats the two section 9 claims together. (Pls.' Mot. at 24–25, 49–50).

(a) *Kit Fox*

 In its letters to the Corps, the Service expressed its concern that "the proposed cut-across road portion of the project is likely to exceed the incidental take coverage for the kit fox permitted in the biological opinion." (A.R. 06202, 06401 (stating that the incidental take coverage has been exceeded because the preconstruction surveys identified 17 potential kit fox dens at the cut-across road site and 33 potential kit fox dens at the Phase 1 Development site)). The Service also maintained that it has information of four sightings of kit fox "within 5 miles of the Diablo Grande and cut-across road area; kit foxes are known to migrate 6 to 8 miles in one night." (A.R.06202–03). The Service provided "[e]xamples of indirect effects associated with the cut-across road that may fragment the kit fox's distribution ...: fragmentation, loss, and degradation of habitat, vehicle strikes, disturbance, reduced prey availability, introduction of non-native species, increased public access, and other associated development." (A.R. 06203). Earlier, in 1998, the Service also informed the Corps that scat found "on Diablo Grande was indicative of San Joaquin kit fox." (A.R.07159). However, the Service does not suggest, nor does the administrative record provide any evidence, that any death or injury to a kit fox has occurred. The Service provides no evidence that habitat modification, for example resulting from excavation of potential kit fox dens (A.R.06445), and degradation of the kit fox habitat has actually resulted in the death or injury of a kit fox.

Neither does the administrative record demonstrate a "reasonably certain threat of imminent harm" to the kit fox. In *Marbled,* the court determined that there was sufficient evidence of future harm where the harm threatened was habitat modification resulting in significant impairment of the protected bird's breeding, and the plaintiffs presented evidence that there were approximately 100 detections of the protected bird during its mating season at the project site. *See Marbled,* 83 F.3d at 1067. However, in this case, the administrative record, at most, demonstrates that kit foxes are in the *vicinity* of the project site. Neither the potential dens, nor the scat, merely "indicative" of the kit fox, demonstrate the presence of, and thus, imminent threat of harm to, the kit fox at the cut-across road or at the Phase 1 site. *See Bernal,* 204 F.3d 920 (affirming denial

of permanent injunction where the protected species used the territory around the project site but had not been detected at the site itself). Moreover, the administrative record demonstrates that there is little threat of imminent harm because pre-construction surveys conducted found no signs of kit fox activity, and no activity at the potential dens; also, the potential dens were excavated to prevent possible entombment of any kit fox. (A.R.06011, 06445).

(b) *Red–Legged Frog*

■ Plaintiffs direct the court to the Service's letters to the Corps to demonstrate takings of the red-legged frog. Nothing in the Service's letters indicate that a taking has already occurred. Rather, the Service suggests that "alteration of habitat in the Phase 1 Development Area and cut-across road likely will result in take of the red-legged frog." (A.R.06402). The Service suggests that take will occur because suitable habitat for the red-legged frog exists in these areas, and "[r]ed-legged frogs have been observed immediately north of the Phase 1 Development and cut-across road ... and in the Orestimba Creek drainage, which is located partially within Diablo Grande property in the south." (*Id.*).

The administrative record contains no evidence that any actual death or injury to a red-legged frog has occurred. As in the case of the kit fox, detection of the red-legged frog at the project site has yet to be made. Additionally, the Service's assertion of that take "likely will result" does not suffice to demonstrate "reasonably certain threat of imminent harm." The administrative record contains no evidence of documented detection of the red-legged frog at the project site, and Diablo Grande's surveys have suggested that no red-legged frogs were found at the project site. (A.R.06226). Accordingly, the court determines that nothing in the administrative record establishes that the Corps's actions were arbitrary and capricious, nor has plaintiff demonstrated that Diablo Grande has violated section 9 of the ESA.[19]

IT IS THEREFORE ORDERED that plaintiffs' motion for summary judgment, and the same hereby is, DENIED;

AND IT IS FURTHER ORDERED that federal defendants' and Diablo Grande's cross motions for summary judgment be, and the same hereby are, GRANTED.

---

19. Plaintiffs moved to strike the Declaration of Malcolm Sproul, submitted in support of Diablo Grande's cross motion for summary judgment, as improper in a record review case and because Sproul purports to provide expert opinion on matters for which he is not qualified as an expert.

 Because the court grants the federal defendants' and Diablo Grande's cross motions for summary judgment without relying on the Sproul declaration, the court need not rule on plaintiffs' motion to strike.

 Also, because the court grants the federal defendants' and Diablo Grande's cross motions for summary judgment, the court does not address the question of irreparable harm and injunctive relief.